IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

WHATLEY COFFEE SERVICE, INC.                                   PLAINTIFF

v.                              NO. 4:04-CV-01029 GTE

SARA LEE CORPORATION and
SARA LEE INTERNATIONAL B.V.                                   DEFENDANTS

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT
## AND TAKING REMAINING CLAIMS UNDER ADVISEMENT

Before the Court is a Motion for Summary Judgment filed by Defendants Sara Lee

Corporation and Sara Lee International B.V. (collectively, "Sara Lee"), to which Plaintiff

Whatley Coffee Service, Inc. ("Whatley") has responded.  Sara Lee has also submitted a reply

brief.  For the reasons stated herein, the Court concludes that Sara Lee is entitled to judgment as

a matter of law on all of Whatley's claims other than the tortious interference claim related to the

Ben E. Keith incident and the related breach of contract claim (Counts II and IV).  The Court

takes said claims under advisement pending further briefing from the parties.

### FACTS WITHOUT MATERIAL CONTROVERSY

Plaintiff Whatley is in the business of selling coffee, cappuccino and related products to

convenience stores, offices, and restaurants.  In conjunction with the sale of coffee and

cappuccino, Whatley also supplies some of its customers with the equipment necessary to make

coffee and cappuccino.  Defendant Sara Lee is a supplier of coffee, cappuccino and related

products.

Beginning in approximately1995, Whatley purchased coffee, cappuccino, and related products from Sara Lee for resale.  Flash Market, a chain of gasoline stations and convenience stores, was one of Whatley's customers for resale of coffee and coffee products in the mid-to-late-1990s.  Beginning in 1999, Whatley lost the account for approximately a year.  On April 21, 2000, Whatley regained the Flash Market account by entering into an agreement under which Whatley agreed, among other things, to install and maintain coffee-making equipment in the Flash Market convenience stores at no charge to Flash Market.  Whatley installed grinders so that whole bean coffee could be ground in the stores and used to make coffee.  On April 24, 2000, Whatley and Flash Market executed an addendum to the agreement pursuant to which Flash Market, in recognition of Whatley's investment in equipment, agreed to purchase from Whatley all of its coffee, cappuccino, and related products over the agreement's 24 month term.  Over the course of the next two years, Whatley obtained from Sara Lee the product necessary to fulfill the agreement with Flash Market.  Whatley's sales to Flash Market were in the approximate amount of $2,500,000 and constituted approximately one-third of Whatley's sales.  On January 24, 2002,Whatley and Flash Market agreed to extend the agreement for another two year period, to run from April 21, 2002 through April 21, 2004.

Thus, from April 24, 2000 through April 24, 2004, Flash Market was obligated to purchase all of its coffee products from Whatley.[1]  Whatley made a significant investment in purchasing the equipment necessary to service the Flash Market account.  The record evidence indicates that Sara Lee was aware that Flash Market was one of Whatley's largest accounts and that Whatley made a significant investment in the account.

---

[1] It does not appear that Whatley considered the "test" Flash Market undertook with Quality Foods to have breached the parties' agreement and Mr. Whatley testified that he was aware of Flash Market's practice of conducting such tests.

Whatley claims that it fell behind on payments to Sara Lee following Sara Lee's implementation toward the end of 2001 of a new billing system. Whatley alleges that it frequently received incorrect bills from Sara Lee and suspended payment to Sara Lee until the billing system was straightened out. Whatley contends that this decision, coupled with the debt from its investment in the Flash Market equipment, eventually resulted in Whatley borrowing money from Sara Lee. By 2002, Sara Lee showed that Whatley had a past due balance of $180,000. On January 1, 2002, Whatley executed a note in favor of Sara Lee in the amount of $180,000. Whatley made timely payments under the noted, but was unable to make the $55,000 balloon payment on the $180,000 note. Instead, it executed a second note in favor of Sara Lee in the amount of $55,000. The second note was executed on November 15, 2003. Whatley has satisfied in full its payment obligations under the note.

Sara Lee filed an Amended Counterclaim in this case alleging that Whatley still has an outstanding balance of approximately $25,000 for coffee purchases.[2] This alleged debt is apparently unrelated to the paid in full promissory note.

Whatley alleges that Sara Lee interfered with Whatley's business relationship with Flash Market in two separate incidents with two separate competitors – Quality Foods and Ben E. Keith. Whatley alleges that said interference was sufficient to constitute the tort of intentional interference with contractual relations and business expectancy and was also a breach of the contractual duty of good faith and fair dealing. Finally, Whatley alleges that Sara Lee breached the parties' contract by failing to offer Whatley a fair price for its coffee and cappuccino making equipment. All three incidents will be discussed separately below.

---

[2] That claim is not addressed in this motion and remains for trial.

Based on these three incidents, Plaintiff alleges the following five causes of action in its Second Amended Complaint:

Count I - Breach of the obligation of good faith and fair dealing by Defendants' conduct in inducing and assisting Quality Foods in obtaining Flash Market's business.

Count II - Breach of the obligation of good faith and fair dealing by Defendants' conduct in inducing and assisting Ben E. Keith in obtaining Flash Market's business.

Count III - Tortious Interference based on Defendants' conduct in inducing and assisting Quality Foods in obtaining Flash Market's business.

Count IV - Tortious Interference based on Defendants' conduct in inducing and assisting Ben E. Keith in obtaining Flash Market's business.

Count V - Breach of Contract for Defendants' failure to offer a fair price to Plaintiff for its coffee equipment.

Plaintiff seeks an award of compensatory and punitive damages.

Also pending in this matter is a Counterclaim filed by Sara Lee. Therein, Sara Lee acknowledges that Whatley has paid in full the promissory note it executed, but claims that Whatley owes Sara Lee $25,506.40 on an account for purchases of coffee, hot chocolate and coffee supplies. Sara Lee seeks this sum, plus interest and attorneys fees.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate, <u>i.e.</u>, "[to] point[] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (citations omitted)(brackets in original)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. Rule 56(e).  The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the

existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## DISCUSSION

The Court will discuss all three incidents separately.  Before doing so, it is helpful to note certain undisputed facts relating to Flash Market, its approach to business, and its relationship with Whatley.  Such facts provide an important underpinning for considering Plaintiff's claims. The Court will also set out the law of tortious interference with business relationships or expectancies because that is the law that must be considered in connection with the so-called Quality Foods and Ben Keith incidents.

## 1.      FLASH MARKET'S BUSINESS MODEL AND RELATIONSHIP WITH PLAINTIFF

Jamie and Shane Patterson are brothers and employees of Flash Market.  Their father, Harold Patterson, owns part of Flash Market and serves as its President.  Jamie and Shane Patterson were the decision-makers in this case in connection with the relevant events.  Jamie Patterson handled the Quality Foods incident, while Shane Patterson was the primary decision-maker in connection with the Ben Keith incident.

It is undisputed that Flash Market was extremely motivated by price.  They were "always looking for a better price."  (Shane Patterson's statement, Def.'s Exh. 2 at p. 11).  As part of its price-cutting strategy, Flash Market was also interested in consolidating its vendors.  Flash Market believed that anytime it could consolidate vendors that it would save money.  (Shane Patterson's statement, Def.'s Exh. 2 at p. 19).

Jamie Patterson explained why:

> You know, if [Quality Foods] offered us the same goods that Mr. Whatley
> was offering with the same price with the same service, we would still switch
> to Quality Foods if we were making a switch on food because we would be

> able to consolidate a vendor.  It would make less work on our office
> personnel, and it would save us a number of dollars behind the scenes.  So
> even if they offered us the same product, same quality, same everything, then
> we would probably have made the switch at the end of our agreement based
> on that.  Not because we weren't getting good service, but based on the fact
> that we could consolidate a vendor and get the same product.

(Jamie Patterson's statement, Def.'s Exh. 3 at p. 18-19).

This business model favoring consolidation contributed to Flash Market's decision to

leave Whatley when the contract expired.  The evidence is undisputed that Flash Market planned

to leave Whatley at the end of the contract term as long as it could match Whatley's price.  Flash

Market's Jamie Patterson gave a sworn statement to Whatley's counsel during which he testified:

> Q. [Plaintiff's counsel]: . . . So the suggestion that you had made a decision that
> you were going to leave Whatley – you didn't know who you were gong to go to,
> but you were going to leave them and go somewhere else is not true?
> A. [Jamie Patterson]: No, that's true, we were going to leave Whatley because we
> were looking to consolidate a vendor, and we were looking for price, and we
> could get a better price if we left.  We were going to leave based on price.  You
> know, that's it.  I mean, it wasn't a situation where – that's why we were going to
> leave.  We were going to leave regardless.
> Q. [Plaintiff's counsel]: Before Keith came in 2004, you were going to --
> A. [Jamie Patterson]: Well, we were looking to find a supplier that we could
> consolidate a vendor and leave.  If it was with Keith or if it was with Quality
> Foods, we were going to leave.  I mean, it was nothing negative against Mr.
> Whatley, but if we could get the same products for the same price, we would have
> left.
> Q. [Plaintiff's counsel]: But you didn't know whether you could or not?
> A. [Jamie Patterson]: No, we didn't know whether we could or not, but I mean --
> Q. [Plaintiff's counsel]: That's my point, I guess, what I'm saying.  You hadn't
> made up your mind that Whatley has done something terrible, and you were going
> to see who has the cheapest price out there?
> A. [Jamie Patterson]: No sir, that wouldn't be a correct statement.  The correct
> statement is that we were looking to consolidate a vendor as long as we could get
> same products for same price, and it just so turns out that we were offered a better
> price for the same product.

(Jamie Paterson's Statement, Def.'s Exh. 3, at pp. 20-21).

This statement by Jamie Patterson is uncontested by Plaintiff in its summary judgment

response.  Even viewed in a light most favorable to Plaintiff, Jamie Patterson's statement shows

that Flash Market wanted to leave Whatley to further its plan to consolidate vendors, but that it

wanted to make sure that it did not pay any more for the product.  The legal significance of Flash

Market's desire to consolidate vendors and to find an alternative supplier is discussed in greater

detail below in connection with the Ben E. Keith incident.

Finally, the record shows that Flash Market held Whatley in high esteem as a vendor and

that the two enjoyed a good relationship.  Jamie Patterson described Whatley's service as

"unparalleled" and "absolutely amazing" and asserted that "no one does the coffee business

better than Mr. Whatley."  (Jamie Patterson's statement, Def.'s Exh. 2 at p. 19).

> Shane Patterson noted:
>
> Well, we have always had a great relationship with Mr. Whatley and Whatley's
> Coffee Service.  They have always done a good job with service.  When the prices
> have been there, we have made our margins that we would like to make.  We've
> never had a problem.

(Shane Patterson's statement, Def.'s Exh. 2 at p. 10).[3]

The fact that the Pattersons were looking to make a change to save money despite the

unparalleled service they received from Whatley underscores that price was the main motivating

factor in their selection of a coffee vendor to supply the Flash Market chain of convenience

stores.

## 2.   LAW REGARDING TORTIOUS INTERFERENCE

To prevail on its tortious interference claim, Plaintiff Whatley must prove five elements:

(1) that it sustained damages; (2) that it has a valid contractual relationship or business

expectancy; (3) that Sara Lee had knowledge of the contractual relationship or business

---

[3]  The evidence shows that the relationship later soured when Flash Market formed the
opinion that Whatley had been overcharging them for product as a result of pricing offered by
Sara Lee in connection with the Ben E. Keith incident.  *See* discussion, *infra*.

expectancy; (4) that by intentional and improper interference Sara Lee induced or caused a

disruption or termination of the contractual relationship or business expectancy; and (5) that the

disruption or termination was a proximate cause of Plaintiff's damages.  (AMI 403).

Interference alone is not enough.  The interference must be improper and Whatley bears

the burden of proving that Sara Lee interfered in way that was improper.  *Mason v. Wal-Mart

Stores, Inc.*, 333 Ark. 3, 11, 969 S.W.2d 160, 164 (1998).  Arkansas has adopted a specific jury

instruction to guide the jury in determining whether specified conduct is "improper."  It reads:

> Plaintiff [Whatley] contends that [Sara Lee's] conduct is improper because [describe
> succinctly the nature of the conduct at issue].  In determining whether Plaintiff has met
> his burden of proof, you may consider the following factors:
> (a)  the nature of the conduct;
> (b)  [Sara Lee's] motive;
> (c)  the interest of Plaintiff in which the conduct interferes;
> (d)  the interest sought to be advanced by [Sara Lee];
> (e)  the social interests in protecting the freedom of action of [Sara Lee];
> (f)  the proximity or remoteness of [Sara Lee's] conduct to the interference;  and
> (g)  the relations between the parties.

(AMI 404).

The following comment to the Restatement's § 767, upon which Arkansas' AMI 404 is

based, illustrates the balancing and case specific approach required in assessing these cases:

> Unlike other intentional torts . . . this branch of tort law has not developed a
> crystallized set of definite rules as to the existence or non-existence of a privilege
> to act in the manner stated in §§ 766, 766A or 766B [defining intentional
> interference as a tort].  Because of this fact, this Section is expressed in terms of
> whether there was a specific privilege to act in the manner specified.  The issue in
> each case is whether the interference is improper or not under the circumstances;
> whether, upon a consideration of the relative significance of the factors involved,
> the conduct should be permitted without liability, despite its harm to another.  The
> decision therefore depends upon a judgment and choice of values in each
> situation.

Comment b to Restatement (Second) of Torts, § 767.

Additionally, even assuming that Sara Lee may be found to have acted improperly, an issue also exists as to whether Sara Lee's improper interference may be said to have induced or caused a disruption or termination of the contractual relationship or business expectancy.  The evidence is that Flash Market intended to consolidate vendors and to leave Whatley after fulfilling its contract term, assuming it could obtain coffee at a price equal to or less than that provided by Whatley.  This was Flash Market's intent when it explored "a test" with Quality Foods and when it made the decision to switch from Whatley to Ben Keith.   Sara Lee may not be held liable for Flash Market's business decision to look for a coffee supplier who also served as another vendor.  This fact bears strongly upon whether Whatley may be found to have had a reasonable expectancy of a continued business relationship with Flash Market.

The parties have not addressed this issue thoroughly in their briefing, instead focusing more heavily on whether Sara Lee interfered and, if so, whether such interference reaches the requirement of "improper" interference.  As to the Ben E. Keith claim, the Court finds that it would benefit from more briefing on this point.

In this connection, it appears that Whatley is not contending that Sara Lee interfered with Whatley's existing contract with Flash Market, which was completed, but that Sara Lee caused Flash Market not to enter into a new contract with Whatley and disrupted or adversely affected Whatley's opportunity to do business with Flash Market in the future.

With this legal framework in mind, the Court will consider Plaintiff's specific allegations of wrongdoing.

### 3.        QUALITY FOODS INCIDENT

The Second Amended Complaint alleges:

In March of 2003, Carolyn Henry, an employee of the Distributor Sales channel of the defendants' Coffee and Tea Division, and one or more employees of Quality Foods,

> attempted to induce Flash Market to terminate its contract with the plaintiff and give its business to a competitor [of Whatley's]. . . Quality Foods.

(Second Amended Complaint, at ¶ 25). It appears, however, that the evidence obtained during discovery does not support the contention that Sara Lee was involved in Quality Foods' solicitation of Flash Market's business or that it induced Flash Market to terminate its contract with Plaintiff.

Plaintiff now acknowledges that it was Quality Foods, not Sara Lee, that approached Flash Market to compete for its business. Sara Lee is alleged not to have approached Flash Market, but rather, to have "participated" or been in "involved" in Quality Foods' effort to obtain the business.

Plaintiff's recently filed trial brief describes its theory:

> In March of 2003, Quality, which was already distributing food products to Flash, approached Flash and solicited Flash's coffee business. Sara Lee was part of this endeavor. Mr. Whatley learned of the solicitation from Jamie Patterson at Flash. Mr. Whatley contacted his Sara Lee sales representative, Sid Jones. Mr. Jones arranged for Whatley to receive lower distributor pricing from Sara Lee, which enabled Whatley to reduce its prices to Flash. Whatley was able to retain the Flash account, but only by substantially reducing its prices to Flash.

(Pl.'s Trial Brief at p. 5).

In early 2003 Jamie Patterson, the Flash Market employee who handled the Whatley account, began implementing several tests of other coffee suppliers. One test was with Farmers Brothers, one was with Folger's, and another was with Quality Foods. Quality Foods was already selling other food items to Flash Market, including deli items. One of Jamie Patterson's reasons for testing Quality Foods as a coffee supplier was to experiment with using the same vendor for food and coffee rather than two separate vendors. From Flash Market's perspective, this made Quality Foods attractive as a potential candidate to become its coffee supplier because

Flash Market believed that such a change – to eliminate Whatley and go with another existing vendor – would enhance its profitability.  (J. Patterson Depo., Def.'s Exh. 4 at pp. 17-20).

There is no evidence that Sara Lee's Carolyn Henry had anything to do with Flash Market's decision to test Quality Foods as a coffee vendor.  Jamie Paterson testified that he initiated the test with Quality Foods as part of Flash Market's "normal business practice" to shop other vendors at the point in time at which they were coming to the end of their agreement.  (J. Patterson Depo., Def.'s Exh. 4 at p 22).

Ultimately, although the test with Quality Foods went well, Flash Market elected not to make Quality Foods its coffee vendor because it (through Shane Patterson) had decided to change food vendors from Quality Foods to Ben Keith.  At that point, Quality Foods was eliminated as a potential coffee supplier because there were no benefits to be realized by consolidating vendors.   (J. Patterson Depo., Def.'s Exh. 4 at p. 23).

Flash Market did, however, utilize the Quality Foods test to try to get a lower price on coffee purchases from Whatley.  That effort, which proved successful, at least for thirty days, provides the factual underpinning for Whatley's claim for tortious interference.

According to Herman Whatley, Jamie Patterson contacted him in February or March of 2003 and advised that Quality Foods had offered him the very same Sara Lee program – the Perk Avenue program – at a "lot cheaper price."   As Mr. Whatley testified:

> . . . He [Jamie Patterson] gave me the – he told me he was going to put it in five stores to see how it worked, how the service was and see if it improved his margins, which he knew it would be cheaper because the price was so much cheaper, and I got him to - - instead of trying it in five stores, I told him I would give him that very same price in all of his stores for 30 days.  That way, he could evaluate the difference in the markup and the margins and it would also give me an opportunity to get with my supplier [Sara Lee] and see if I couldn't get some competitive allowances.  And he agreed to do that.

(Whatley Depo., Pl.'s Exh. 1 at p. 66).

On that very day, Mr. Whatley then telephoned his Sara Lee representative – Sid Jones – and requested assistance.  Mr. Whatley asked Mr. Jones: "how much cheaper can Quality Foods buy this product than I'm buying it because they've offered quite a substantial difference in the price?"  Mr. Jones is alleged to have responded:  "'I'm not privy to the information that you're asking for.  I don't know what Quality Foods is paying for it.  I know that those grocery store guys make some weird deals from time to time, but, . . .let me see what I can find out about this thing."  (Whatley Depo., Pl.'s Exh. 1 at p. 67).

Mr. Jones called Mr. Whatley back promptly and advised that he had talked to Carolyn Henry, that everything was smoothed out, and to let him know "if the Pattersons got ruffled again."  At the end of the 30 days, Mr. Whatley went back to Jamie Patterson and told him that he could not live with the prices.  *Id*.  Apparently, Mr. Whatley was then permitted to go back to his normal pricing.

Whatley makes many assertions of  <u>immaterial</u> fact, but no factual allegations which, if believed, would permit a jury to find that Sara Lee's interference was improper to a tortious degree.  The Court will not repeat in detail the numerous assertions of immaterial fact or every leap of logic engaged in by Whatley to support its claim.[4]

The record evidence will not permit any reasonable fact-finder to conclude that the Defendant Sara Lee, via Carolyn Henry, was responsible for Quality's decision to solicit Flash Market.  Flash Market itself had made a business decision to look into consolidating vendors in order to save money.   Flash Market's Jamie Patterson called Quality Foods to get the test started.  There is no evidence upon which Carolyn Henry (or anyone else from Sara Lee) may be held

---

[4]  The Court understands that many such facts are probably put forth by Whatley to present the "big picture" of this dispute.

responsible for Quality Foods' decision to compete with Whatley for Flash Market's coffee business.

The Court explicitly rejects Plaintiff's contention that the fact that Carolyn Henry, when called by Sid Jones, failed to deny being part of Quality's solicitation of Flash's business, may be treated as affirmative evidence that she did that which she failed to deny.   There is no evidence that Mr. Jones specifically inquired of Ms. Henry whether she had done so.  Accordingly, the assertion regarding what Ms. Henry's failure to deny may mean is sheer conjecture.  More importantly from an evidentiary standpoint, Ms. Henry's "failure to deny" her involvement may not be treated as substantive evidence.  This is not even an inconsistent statement,[5] but assuming it were, a prior inconsistent statement not under oath does not qualify as substantive evidence. *See Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1311 (8th Cir. 1993)(noting that a prior inconsistent statement may be admissible for impeachment, but not for the truth of the matter contained therein).

There is yet an additional problem with Plaintiff's theory.  The evidence is that Quality Foods went after Flash Market's business with another product – Roaster's Exchange – a non Sara Lee product.  Carolyn Henry testified that Quality Food's Doug Edmonson advised her it was "going after" Flash Market's business, but that it was going to use Roaster's Exchange, a non-Sara Lee product.  Roaster's Exchange was a Sara Lee competitor.  Although Sara Lee sold coffee to Quality Foods under a private label, it had nothing to gain from Quality Food's use of a competing product.  Thus, Sara Lee denies even providing a price quote to Quality Foods in

---

[5]  Ms. Henry denied providing any assistance to Quality Foods in connection its attempt to solicit Flash Market's business.  According to Ms. Henry, she did not even provide a price quote to Quality Foods because she was advised that Quality Foods was going to use Roaster's Exchange, a competitor's coffee product, in connection with its effort to obtain Flash Market's business.

connection with the solicitation of Flash Market's business.[6]  (Depo. of Carolyn Henry, Pl.'s Exh. 12, at pp. 41-44).  Moreover, it does not appear that Sara Lee was even selling the same coffee product to Quality Foods and Whatley.  Sara Lee was selling Quality Foods a private label product, but selling Whatley Superior brand coffee from a special Citgo price list made available to Citgo franchisees.

So, what evidence exists to support Plaintiff's contention that Sara Lee's "participation" or "involvement" was improper?  First, the Court rejects as a matter of law any assertion that Sara Lee's mere act of providing pricing to two different suppliers who are competing for the same business may be considered "improper" and tortious.  Whatley makes much of the fact that Sara Lee is not a direct competitor of either Quality Foods or Ben Keith.  That misses the point.  Sara Lee sold coffee products to both Quality Foods and Whatley.  When the two suppliers competed for the same business, Sara Lee was entitled to provide "assistance" to both of its suppliers in the form of the pricing or support it normally provided.  Thus, Sara Lee had a competitive interest in selling its product to its suppliers – even when those suppliers were in direct competition for the same business.

Here, there is no evidence that Sara Lee attempted to favor one supplier over another in a manner that may be considered "improper."  While Whatley believes that Sara Lee favored Quality Foods by providing it with lower pricing, Sara Lee denies it and there is no evidence, except through Jamie Patterson, that Sara Lee actually undercut Whatley's pricing.[7]

---

[6]  The Court does mean to suggest that if Sara Lee had done so that it would have been a tortious act.

[7]  It seems likely that Mr. Patterson was leveraging the situation to obtain a more favorable price from Whatley.

Even assuming, for purposes of summary judgment, that Sara Lee, through Carolyn Henry, in fact quoted a price for coffee product to Quality Foods that was lower than the price offered to Whatley, Whatley still has failed to present sufficient evidence to make a submissible jury case on the issue of tortious interference.  Such a quote would have been for a different coffee product than the Superior brand being sold to Whatley and would have originated from a completely different distribution channel.

 The evidence is that Carolyn Henry and Sid Jones worked in separate and independent channels of distribution established by Sara Lee to serve different types of Sara Lee customers. Carolyn Henry was not assigned to Whatley's account, which was serviced by Sara Lee's Sid Jones.  Sara Lee's Sid Jones, when contacted by Herman Whatley, did not even know what price Sara Lee, through Carolyn Henry, would have offered Quality Foods.  Likewise, the record does not indicate that Carolyn Henry would have been privy to Sara Lee's pricing offered to Whatley prior to the point in time at which she allegedly quoted a price to Quality Foods.

Most importantly, Sara Lee, upon learning of the (allegedly) lower pricing offered by Carolyn Henry, made a price concession to assist Whatley with the thirty day period it slashed its prices to Flash Market.  Such an action seriously undercuts any assertion that Sara Lee intended to harm Whatley.  From the record, it does not appear that Sara Lee's price concession was limited in time.  Thus, Whatley apparently was able to leverage a  permanent price concession from Sara Lee as a result of this incident.[8]

---

[8]  Aside from the issue of whether there was an improper interference, the Court questions whether Whatley could come forward with the required showing of actual damages, another essential element for a successful tortious interference claim.  Assuming that Whatley was able to obtain a permanent price concession from Sara Lee, would not this more than have offset any economic harm sustained by Whatley during the thirty day period it lowered it prices to Flash Market?  The Court's ruling is in no way based on Whatley's failure to prove actual damages, which has not been adequately briefed by the parties.

There is no evidence that Sara Lee or Carolyn Henry set out to divert business from Whatley to Quality Foods.  Even assuming that Sara Lee, through Carolyn Henry, quoted a price to Quality Foods, knowing that Quality Foods would use that quote to attempt to take business away from Whatley, such conduct alone, considering the totality of the circumstances, does not rise to the level of a tortious interference.

Flash Market acknowledges that it was price shopping and using everything at its disposal to get a better price from Whatley.  Significantly, Flash Market was not comparing apples to apples when it compared Whatley's price to that offered by Quality.  Jamie Patterson acknowledged that the prices Quality Foods quoted did not include service.  Quality Foods' coffee quote was only for drop off service and did not include any of the service Whatley provided.  Mr. Whatley, however, took Jamie Patterson at his word without inquiring to determine what exactly Quality Foods was providing for the price alleged.  Had he inquired, perhaps Mr .Whatley would have learned that Quality Foods' price included no service whatsoever.  Instead, Mr. Whatley immediately offered to match Quality Foods' pricing to keep Flash Market from going forward with the Quality Foods' test.

Whatley goes to great lengths in its summary judgment response to point out alleged inconsistences in Carolyn Henry's statement and her motive to assist Quality Foods in obtaining Flash Market's business.  Such evidence simply does rise to the level of substantive evidence to prove that Carolyn Henry intentionally acted for the purpose of improperly interfering with Whatley's relationship with Flash Market and that such interference proximately caused a disruption to Whatley's legitimate business expectancy.

Causation is also problematic in this scenario because Flash Market initiated the test with Quality Foods.  How can there be any inducement by Sara Lee when Flash Market was exploring

its options to save money by consolidating vendors and Whatley, as a single product vendor, could not compete with multiple product vendors such as Quality Foods?   The Court understands that Whatley's theory is that Ms. Henry disrupted its relationship or business expectancy by offering a lower price to Quality Foods, but the proof is sketchy on this point, and even if Ms. Henry did so, no reasonable jury could find that Ms. Henry's actions constituted an intentional and improper interference on the basis of this particular summary judgment record.

After considering all of the facts and circumstances, the Court has no hesitation in concluding that Sara Lee's conduct in this situation, even assuming everything Whatley alleges is true, simply does not rise to the level of a tortious interference.

### 4.    BEN KEITH INCIDENT

In late 2003, Flash Market switched food distributors – moving from Quality Foods to Ben E. Keith ("BEK").  Whatley continued to supply Flash Market with coffee.  In February of 2004, Richard Shemwell, a BEK sales representative, approached Flash Market and solicited its coffee business.  Flash Market's Shane Patterson indicated that it wanted to continue using Sara Lee Superior coffee products, but that it was interested in purchasing coffee from BEK if it could supply the same coffee at a better price and also provide free coffee-making equipment and service.

BEK contacted Carolyn Henry to inquire if it could purchase the brand of coffee specified by Flash Market, known by its brand name as World's Finest Coffee (also known as Superior label), the same coffee that Whatley had been selling to Flash Market.  Carolyn Henry advised BEK that since it was a distributor for other Sara Lee products that it could purchase that coffee from Sara Lee.

In February of 2004 Sara Lee employee Carolyn Henry attended a meeting with BEK's Richard Shemwell and Shane Patterson at Flash Market's headquarters in West Memphis. The evidence is disputed as to whether pricing was presented or discussed during the meeting. It appears undisputed, however, that Sara Lee later reneged on the original price that it quoted to BEK and Flash Market during the negotiations. Flash Market refused to pay the increased price and that ultimately resulted in BEK finding a different coffee supplier.

During the February meeting, Shane Patterson expressed concern about not injuring Whatley by leaving it with a bunch of useless equipment. Through Carolyn Henry, Sara Lee agreed to make an effort to purchase Mr. Whatley's equipment. (Carolyn Henry Depo., Def.'s Exh. 6, at pp. 112-17). After Mr. Whatley refused Sara Lee's offer to purchase its used coffee making equipment for $25,000, Sara Lee began to consider the possibility that it could provide the equipment for BEK to place in Flash Market's stores. (*Id*. at p. 131).

Sara Lee could not get the approval to provide BEK with the necessary new equipment. BEK did not want to provide the equipment. Sara Lee's price adjustment to provide new equipment and coffee was unacceptable to BEK and Flash Market. As a result, the deal between Sara Lee and BEK ended. The "coffee deal" between Sara Lee and BEK only lasted a few weeks. (*Id*. at p. 144). Ultimately, BEK found a different supplier with an equipment program and purchased coffee from it for resale to Flash Market.

Sara Lee's motion is based in part on its assertion that its conduct may not be considered improper interference because at the time it attended the meeting, Flash Market had already decided to quit purchasing coffee products from Whatley.

Viewing the facts in a light most favorable to Whatley, a reasonable jury could find that Flash Market had not yet made its final decision to leave Whatley but was waiting on a price

quote from BEK to make its final decision.  Accordingly, the Court rejects Sara Lee's contention that Whatley's claim must fail because Whatley was already "out" as Flash Market's coffee vendor before Carolyn Henry became involved in BEK's effort to win the business.

The legal significance of this distinction remains to be seen.  Regardless of Flash Market's actual intent and the precise moment at which it knew the decision had been made to leave Whatley, is not what Sara Lee <u>believed</u> more important?

Sara Lee also argues in the alternative that Sara Lee's involvement with offering to sell coffee to BEK for resale to Flash Market may not be found to be an improper interference as a matter of law.  That argument is more compelling, but the Court stops short of making the decision as a matter of law at this point.

Carolyn Henry denied agreeing to sell coffee to BEK at a substantially lower price than Whatley's price for the same product, but there is other evidence in the record from which the jury could find that Sara Lee and BEK approached Flash Market and offered "the same coffee" and "the same program" but at a cheaper price.  Shane Patterson testified that BEK's Richard Shemwell brought in pricing for coffee and cappuccino and that when Shane compared the prices with those that Flash Market was currently paying through Whatley, there was "quite a bit of difference."  (Shane Patterson Depo., Pl.'s Exh. 19 at p. 64, 85).  Richard Shemwell testified that he contacted Carolyn Henry for pricing.  He also testified that he met with Carolyn Henry "to see if Sara Lee could help Ben E. Keith establish" or get the business.  (Shemwell's Dep., Pl.'s Exh. 18 at p. 25).

Whatley also contends that Sara Lee treated it differently and less favorably than BEK by denying it access to an equipment program but attempting to put one together for BEK.

Mr. Patterson testified that when Flash Market learned that it could obtain the same coffee so much cheaper from BEK that it soured the relationship.  As Shane Patterson described in explaining why Flash Market did not attempt to return to Whatley when the deal with BEK and Sara Lee fell through:

> We could have gone back to Mr. Whatley, yes, sir, but things had changed.  I mean, our relationship had always been very well with Mr. Whatley, but we were told that we could get this at a cheaper price.  You have to assume that he was already getting it at a cheaper price and we had just been getting overcharged all this time.  So the option for me to go back to Mr. Whatley wasn't much of an option.

(Shane Patterson Depo., Pl.'s Exh. 19 at p. 71).

Certainly, the evidence would permit a finding that Sara Lee was reckless in offering such a low price to Ben E. Keith for resale to Flash Market – a price that it ultimately could not meet -- that it caused Flash Market to believe that Whatley had been overcharging it for coffee.  Is this enough, however, to create a submissible claim for tortious interference?  Since this issue has not been specifically briefed by the parties, the Court directs the parties to provide the Court with additional legal briefing regarding this claim.

In other words, assuming that a jury could find that Sara Lee's Carolyn Henry acted improperly when she offered to sell coffee product to Ben Keith at a substantially lower price than Sara Lee had been selling the same product to Whatley, may her conduct be considered intentional so as to constitute a tort?  If Carolyn Henry <u>believed</u> that Whatley "was out" would not that justify her in negotiating in good-faith to provide a quote to Ben E. Keith regardless of whether Whatley was actually out or Flash Market was just price shopping?   From the evidence, it appears that the price Carolyn Henry provided to BEK and Flash Market during the negotiations was not in fact a price that even Sara Lee could live with.  An argument exists that this low ball and fictitious pricing caused Flash Market to form the mistaken belief that Whatley

had been overcharging it for years and destroyed Whatley's expectancy of being able to even

compete for Flash Market's business.  And, Carolyn Henry knew that Flash Market was

Whatley's customer and that Whatley was a Sara Lee supplier, albeit from a different Sara Lee

distributor channel.  The Plaintiff has presented evidence that Carolyn Henry's conduct violated

Sara Lee's own internal policy not to move business from one channel to another.

   The facts here, viewed in a light most favorable to the Plaintiff, are sufficient to

demonstrate that Sara Lee, via Carolyn Henry, was reckless and that its conduct caused Whatley

to be viewed in a false light by Flash Market, thereby precluding Whatley from enjoying the

business expectancy (in the form of the ability to compete for Flash Market's business) that it

would have otherwise enjoyed.  The Court concludes that if a supplier such as Sara Lee offers the

identical product to distributors whom it knows are competing for the same business then it is

arguably tortious to offer more favorable terms and conditions to one distributor such that the

favored distributor receives an unfair advantage.

   It seems to the Court, however, that an issue also exists regarding the extent to which

Whatley may be said to have had a valid business expectancy in this case.  In light of the fact that

Flash Market's consolidation plan excluded Whatley – a single product vendor –  from

consideration for future business, how can Sara Lee's conduct be said to have proximately

caused an interruption to Whatley's legitimate business expectancy?   Absent Flash Market's

undisputed plan to consolidate vendors, Whatley's case would be stronger.

   The Court requests the parties to brief the issues noted herein further prior to trial.

**5.      PURCHASE OF COFFEE MAKING EQUIPMENT**

   As the Court described above in connection with the BEK incident, Carolyn Henry agreed

during the BEK-Flash Market negotiations to make Whatley an offer for its coffee-making

equipment.  In March of 2004, Sara Lee's Carolyn Henry offered Whatley just under $25,000 for the coffee making equipment then in place in Flash Market's stores.  Whatley rejected this offer as too low and gave an indication of how much he thought the equipment was worth.  Sara Lee rejected the counter-offer and did not make another offer.

Plaintiff offers the testimony of expert Joyce Norrell, who has ten years of experience evaluating and purchasing coffee equipment.  Ms. Norrell valued the Whatley equipment, already in place in Flash Market's approximately sixty stores over a three-state area, at $87,303.70.

Plaintiff contends that Sara Lee breached an agreement with Flash Market to offer a fair price to the plaintiff for the plaintiff's equipment then in place in Flash Market stores, equipment that Flash Market knew would be useless to Whatley when Flash Market changed vendors to go with Ben E. Keith.  The record evidence indicates that Ms. Henry, on behalf of Sara Lee, assured Mr. Patterson that Sara Lee would make a fair offer to purchase Whatley's equipment.  The record further supports Plaintiff's assertion that Flash Market was concerned that Whatley not get stuck with the equipment and that it required Sara Lee to offer Whatley a fair price for the equipment.

While this evidence might well be admissible at trial for other purposes, it is insufficient to permit Plaintiff Whatley to prevail on its claim for breach of contract based on its third-party beneficiary status.  Although Arkansas recognizes that a third-party beneficiary to a contract may have a claim for the contract breach of one of the parties, the theory requires a valid and enforceable contract.  In other words, "a promise creates no duty to a beneficiary unless a contract is formed between the promisor and the promisee; and if a contract is voidable or unenforceable at the time of its formation the right of any beneficiary is subject to the infirmity."

Rest. 2d Contracts, § 309(1).  In the absence of a valid contract, there can be no valid third-party beneficiary claim for breach of contract.

That is the situation here.   Flash Market was in negotiations with Ben E. Keith when the promise was allegedly made by Sara Lee that it would make an offer to Whatley to purchase its equipment located in Flash Market stores for a "fair price."  Whatley contends that Sara Lee's promise rises to the level of an enforceable contract.  The Court disagrees.

The uncontroverted facts permit only one reasonable conclusion – Sara Lee, through Carolyn Henry, made a gratuitous promise to offer Whatley a "fair price" for its equipment – in furtherance of the contract negotiations between Flash Market and Ben E. Keith.[9]  This conclusion is further supported by the fact that the initial contract pricing terms proposed either during the meeting attended by Sara Lee's Carolyn Henry or shortly thereafter did not end up being the final terms.[10]  Just as an enforceable contract was not agreed upon between Flash Market and BEK during the negotiation meeting, neither was an enforceable contract reached between Flash Market and Sara Lee.

Additionally, Flash Market was not required to do anything in exchange for Sara Lee's alleged promise to offer Whatley a "fair price" for its equipment.  Thus, no contract was formed because there was no consideration for the promise.   For a contract to be enforceable, it must impose mutual obligations on both of the contracting parties.  *Superior Fed. Bank v. Mackey*, 84

---

[9]  As Flash Market's Jamie Patterson described those negotiations, "when we're negotiating the deal to change we were not negotiating with Sara Lee in any way.  We were negotiating with Ben E. Keith."  (Patterson depo. at p. 47, Exh. 4 to Def.'s motion).

[10]  The record indicates that following the meeting and after further consideration, Sara Lee realized that the prices quoted to Flash Market during the meeting were too low and that, in fact, it could not sell its product to Ben E. Keith for resale to Flash Market at those prices.

Ark. App. 1, 129 S.W.3d 324 (2003).  The alleged agreement is unenforceable for lack of consideration.

The Court concludes that Defendants are entitled to judgment as a matter of law as to Count V of Plaintiff's Second Amended Complaint

### 6.   CONTRACT CLAIMS FOR FAILURE TO NEGOTIATE IN GOOD FAITH

Counts I and II are based on the theory that Sara Lee's tortious interference in connection with Quality Foods and Ben E. Keith also constitutes a breach of Sara Lee's obligation of good faith and fair dealing in its performance of its contract with Whatley.  Sara Lee's commission of a separate tort is the only basis for the contractual liability alleged.  (*See* Second Amended Complaint at ¶¶ 47-54).  Accordingly, if the related tort law claim fails, the good-faith breach of contract claim fails with it.

Count One fails because the tortious interference claim with Quality Foods fails.

The Court takes under advisement Count Two, which relates to the Ben E. Keith incident. The Court expresses serious doubt about the claim, however.  Whatley and Sara Lee had an oral agreement pursuant to which Sara Lee sold Whatley coffee at certain agreed upon prices.  In the absence of any breach of the parties' agreement, how can Sara Lee's alleged assistance to Ben E. Keith to obtain the Flash Market account (even if it may be found to be tortious) be found to be a breach of Sara Lee's oral agreement to sell coffee to Whatley at a specific price?

### 7.   PUNITIVE DAMAGES

The evidence in this case will not support a submissible claim for punitive damages. That claim will be dismissed.

**CONCLUSION**

For the reasons herein stated,

IT IS HEREBY ORDERED THAT the Motion for Summary Judgment filed by Defendants Sara Lee Corporation and Sara Lee International B.V. (Docket No. 72) be, and it is hereby, GRANTED IN PART AND TAKEN UNDER ADVISEMENT IN PART. The claims asserted by Plaintiff Whatley in Counts I, III, and V of its Amended Complaint are hereby DISMISSED WITH PREJUDICE. The Court takes under advisement the tortious interference claim related to the Ben E. Keith incident which is asserted by Plaintiff in Count IV of its Amended Complaint and the related breach of contract claim asserted in Count II. The Court requests further briefing from the parties on these claims as requested herein. Said briefing shall be submitted not later than **July 12, 2006.** The Court may either permit the remaining claims to go to trial or may rule to dismiss said claims.

IT IS SO ORDERED this ___5th___ day of July, 2006.

_____/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE